DAVID MAGEE, Executor of DAVID MAGEE, dec'd, *v.* ABNER
OSBORN, impleaded with JOSEPH NAYLOR and RICHARD
CALROW, Jr.

Where there is any conflicting evidence as to the genuineness of defendant's sig-
nature to a bond on which the action is founded, the case should go to the jury,
and their finding in that respect is conclusive.

There being no motion for a new trial on a case or exceptions at Special Term,
the question whether the judgment should be reversed on the facts is not
before the Court at General Term on appeal.

Where the only exceptions taken at Special Term were to the refusal of the
court to nonsuit the plaintiff, on appeal, the only question before the court is,
whether there was sufficient evidence to send the case to the jury.

Upon the question of the genuineness of the defendant's signature to a bond,
if the witness swear that he has seen the defendant write, and that he believes
the signature to the bond to be genuine, etc., it is sufficient evidence thereon
to give the case to the jury.

APPEAL from order of General Term of New York Supe-
rior Court granting new trial, with stipulation for judgment
absolute.

The action was upon a bond of indemnity against a mechan-
ic's lien, alleged to have been executed by defendant Naylor
as principal, and defendants Osborn and Calrow as sureties.
Calrow was not served with process. Naylor and Osborn
answered, denying in general form the allegations of the
complaint.

The cause was tried before Mr. Justice MONELL, and a jury,
in May, 1863, and a verdict rendered against both defendants.
Osborn appealed from the judgment entered on the verdict
to the General Term, where it was reversed as against him,
and a new trial ordered.

The bond could not be produced on the trial, and the cir-
cumstances under which it was given and lost, as the evidence
tended to establish, were these: In July, 1854, the plaintiff,
being the owner of certain premises in the city of New
York, made a contract with the defendant Naylor to erect
a building thereon. Subsequently a litigation arose between
them in regard to the contract, which was adjusted in May,

1855, according to the terms of a written agreement entered into by the parties. By this arrangement the plaintiff was to pay Naylor $1,800, in full settlement of all his claims under the contract. Prior to the settlement, one Butler had filed a mechanic's lien upon the building for materials furnished to Naylor, and by the terms of settlement the plaintiff was to reserve out of the $1,800 the sum of $650 to protect himself against the claim of Butler, or Naylor was to give Magee a bond of indemnity against the claim of Butler.

Naylor elected to give the bond, and when the matter was closed a bond was executed in conformity with the terms of the original agreement of settlement, and delivered to Magee, and he paid Naylor the $1,800. It was not denied on the trial that Naylor and Calrow signed this bond, and the principal question litigated was, whether Osborn was a party to it, whether he signed it.

In the subsequent prosecution of the suit, instituted by Butler to enforce his lien, this bond was put in evidence before the referee, and was marked as an exhibit in the case, and handed back by the referee to the counsel appearing for Magee and Naylor. From that time the bond was missing, and all efforts to find it were unsuccessful. All the counsel, and the referee in the suit in which the bond was produced, as well as the defendant Naylor, testified to the circumstances under which it was lost. A thorough search was made for it in the office of Magee and Naylor's counsel, but without success, and Naylor, whom it was intimated might have abstracted it, testified that the last time he ever saw it was when it was produced before the referee.

The contents of the bond were proved by the original agreement of settlement in conformity with which it was drawn, and by the draft of it, which was produced by the defendants. Its breach was proved by evidence of the judgment record in favor of Butler against Magee and Naylor, and the payment, by Magee, of $800 and sheriff's fees to discharge the lien on his property. There was no question in regard to the amount that the plaintiff was entitled to recover, if anything.

To prove the execution of the bond by the defendant Osborn (who was the brother-in-law of Naylor), the plaintiff introduced as a witness Mr. Parsons, a counselor-at-law, who acted as counsel for Naylor in the suit brought against Magee on the building contract; and who subsequently acted for Magee and Naylor in the controversy with Butler as to the mechanic's lien. Parsons testified that soon after the agreement was executed for settling the suit brought by Naylor, a bond was prepared in conformity to the agreement—he thought by himself—and submitted to Magee's counsel for approval; this bond purported to be signed by three parties, or three names, and had their seals. Whether it was signed in his presence or not, he would not be positive; it purported to be signed by Joseph Naylor, Abner Osborn and Richard Calrow, Jr.; he delivered the bond to the counsel of Magee upon the completion of the settlement. Subsequently on the trial of the case of Butler, he next saw the bond. Pending that trial it was produced and put in evidence, and at his request it was handed to him and he put it among his papers. Afterwards during the reference the paper was called for; he looked among his papers, and caused and made a very thorough search but could not find it, and had never seen the paper since. It was his impression that at the adjournment of the reference on the occasion that he put it among his papers. Naylor took his papers to his office, but of that he was not positive.

His examination was then continued as follows:

Q. Have you ever seen Osborn's handwriting? A. I believe I have on several occasions.

Q. Were you acquainted with it? A. I think Osborn was at my office and executed one or more papers on several occasions in behalf of Naylor in several matters, and my recollection is, that I saw him execute several papers; I know that I have seen Calrow write several times; I have done business for him, and I thought I recognized those signatures.

Q. (By the court.) Did you know the handwriting? A. I thought I did.

Q. (By counsel for defendant.) Do you say now that you did? A. I think I did know the handwriting of Osborn.

Q. You recognized that bond as being signed by him, and by Calrow and Naylor? A. Yes, sir, and by Naylor.

Witness: That was my best recollection; that I have seen Osborn write in my office, on one or more occasions when he came to execute papers, and I became acquainted to that extent with his signature at that time, and recognized this at the time as a genuine instrument.

*Cross-examination:* Q. Have you any recollection how often you saw Osborn write? A. I have not.

Q. Can you say that you ever saw him write three times in your life? A. I could not positively say that I had.

Q. Can you say now that you know his handwriting? A. I think I should know his signature if I saw it.

Q. Could you tell it from a tolerable imitation? A. I am not an expert in signatures; if there was a good imitation I should call it his; and so of anybody's else.

Q. Are you sufficiently familiar with his handwriting to discriminate between a genuine and a tolerable good imitation of the signature? A. No, sir; I do not know that I am.

The plaintiff Magee testified, that he first saw the instrument spoken of as a bond of indemnity at the time of the settlement of the Naylor suit; that it purported to be signed by Joseph Naylor, Abner Osborn and Richard Calrow, Jr.; thinks it has an attesting witness; that it was acknowledged when received by him; that he retained it in his possession until the hearing before the referee in the Butler suit; he was subpœnaed to bring the bond on that trial; that he left it with Parsons; had never seen it since.

The plaintiff rested, when the counsel for the defendant Osborn moved to dismiss the complaint, on the following grounds:

1. There is not sufficient evidence of the genuineness of the signature of Osborn to the bond.

2. Evidence of the handwriting of Osborn's signature is not proper, as it appears by other evidence in the case that there was an attesting witness to the bond.

3. Secondary evidence cannot be given of a certificate of acknowledgment, for the purpose of making a lost bond evi-

dence, without any proof of the genuineness of the signature.

4. There is no evidence that the alleged certificate was in compliance with the requirements of that statute.

The motion was denied, and exception taken.

The defendants Osborn and Naylor were then sworn in their own behalf: Osborn denied, in substance, knowing anything about the alleged bond. Naylor admitted the existence of the bond, but said nothing as to its execution or the parties to it. Afterwards the plaintiff, being recalled, testified, that he called at Osborn's office after the recovery of the judgment in the lien suit; told him he was one of the bondsmen in security for that lien on the store; that judgment had been obtained, and the property was advertised to be sold; Osborn said: "I don't recollect now anything about that, Mr. Magee;" said he had signed various bonds for Naylor, but had no knowledge of signing one for Magee; he did not deny positively having signed the bond.

At the close of the testimony, the counsel for the defendant Osborn, renewed his motion to dismiss the complaint, on the grounds before stated; which motion was denied, and exceptions taken.

The case was submitted to the jury (Osborn excepting to no part of the charge), and they found a verdict for the plaintiff against Osborn and Naylor.

Judgment being entered, the defendant Osborn appealed from the judgment to the General Term. The General Term reversed the judgment, and ordered a new trial as to him. From this order the plaintiff appeals to this court, stipulating that if the order be affirmed, judgment absolute may be rendered against him.

*J. A. Burrall,* for the plaintiff.

*S. P. Nash,* for the defendant Osborn.

WRIGHT, J. The only exceptions taken by the defendant Osborn, were to the introduction on the trial of the writing executed by Magee and Naylor, on the settlement of the suit

brought on the building contract, and to a denial of a motion for a nonsuit. The first of these was clearly without merit.

The point now urged, that the court erred in receiving secondary evidence of the bond, for the reason that there was no sufficient proof of its loss, was not raised by any exception by either of the defendants. It is true that the objection was incidentally interposed, as a witness who drew the paper was being interrogated in respect to its contents, but no exception was taken to the decision of the judge overruling the objection. Indeed, the proof on the point (the sufficiency of which was for the judge, and not the jury) was ample and conclusive. The single question then is, was it error, so far as Osborn was concerned, to submit the case to the jury?

The nature and terms of the instrument in question were fully shown, and the only matter really in any doubt at the close of the case, was the genuineness of Osborn's signature to it. Naylor had contracted in July, 1854, to build a house for the plaintiff, Magee, and before the building was completed, one Butler filed a mechanic's lien upon it for materials furnished to Naylor. Upon the completion of the building, Naylor sued the plaintiff to recover the amount claimed to be due to him on the contract. This suit was settled in May, 1855, upon these terms: the plaintiff was to pay to Naylor $1,800 in full of his claim under the contract, and Naylor was to allow him either to retain $650 out of that sum (an amount supposed to be sufficient to cover the claim upon the lien of Butler), or else give to him his (Naylor's) bond, with sufficient security, to be approved by the plaintiff's attorney, in the penal sum of $1,200, conditioned to indemnify the plaintiff against all claims and demands upon such mechanic's lien, whether valid or not, or any suit or proceeding thereon, or by reason thereof, and against all expenses of defending any such claim or demand, and any sum recovered by reason thereof. Naylor elected to give the bond of indemnity. Shortly afterwards, the plaintiff's attorney paid to Mr. Parsons, the attorney of Naylor, and who managed the business for him, the $1,800, and received the bond from Parsons

in conformity with the terms of the settlement, subsequently
delivering it to the plaintiff. It was on this indemnity bond,
shown to have been afterwards lost, the action was brought
in January, 1863, after Butler had obtained a judgment
establishing his lien, and the plaintiff had been compelled to
pay over $800 in satisfaction and discharge of such judg
ment. That the instrument, when delivered to the plaintiff,
purported to be signed by Naylor, Osborn and Calrow, was
proved beyond dispute. Parsons, who had prepared it for
execution, testified distinctly to the fact, and so did the plain-
tiff, who had it in his possession until called to produce it on
the Butler lien trial.

The origin of the bond, its contents, its delivery to the
plaintiff, and the fact that when delivered it purported to be
signed by Naylor, Osborn and Calrow, were thus clearly estab-
lished. That Naylor executed it was not in doubt by the
proof, and the single open question left was, whether what
purported to be the signature of Osborn was, in fact, his.
Osborn, who had, in his answer, simply interposed a general
denial of the allegations of the complaint, set up, on the
trial, that his brother-in-law, Naylor, to whom he was, at the
time, in the practice of lending his name on bonds and notes,
had forged his name to the bond, although there was not the
faintest evidence tending to such a conclusion. Parsons, the
attorney who arranged the settlement with Magee on behalf
of Naylor, had drafted the bond, but it was not signed in his
presence. It was in his hands, however, after its execution,
and he had full opportunity for examining it before passing
it over to the plaintiff's attorney when the settlement was
concluded. On the question of the signature attributed to
Osborn being genuine, he testified in substance (referring
to about the period of the delivery of the bond to plaintiff,
which was eight years prior to the trial) that Osborn was at
his office and executed one or more papers on several occa-
sions in behalf of Naylor; that he saw him write on one or
more of those occasions; that he became acquainted to that
extent with his signature at that time; that he did know the
handwriting of Osborn, and recognized the bond in ques-

tion as being signed by him; recognized it at the time as a genuine instrument. On cross-examination he said, that he could not positively state that he had ever seen Osborn write three times; that he thought he should know his signature if he saw it; was not an expert in signatures; if there was a good imitation he should call it his, and so anybody's else; that he did not know that he was sufficiently familiar with his (Osborn's) handwriting to discriminate between a genuine and a tolerably good imitation of the signature.

Osborn himself subsequently was a witness in his own behalf. He did not deny positively, but only inferentially, his signing the instrument. He claimed to have executed but five bonds in behalf of Naylor; four of which he exhibited a memorandum of, and the other, of which he had no memorandum, he thought was a bail bond he had signed at Parson's office, in a suit against Naylor brought by one McArdle. He stated that about a month before the present suit was brought, Magee, the plaintiff, called upon him in relation to the bond, when he told him that he never signed any such bond; had no knowledge of it; and had never heard of it before; but of this interview Magee gave a different version. Osborn, he said, stated that he had signed a number of bonds for Naylor, but he did not then recollect of having signed one for Magee, and that he did not deny positively that he had executed the bond in question.

Naylor, also, who had interposed the same defense, by answer, as his co-defendant, Osborn, was a witness on his own part. He did not deny the execution of the bond, nor was he inquired of by Osborn in regard to it.

It appeared, furthermore, from the testimony of Osborn, that Naylor, Calrow and himself were brothers-in-law, and that at the time the bond was alleged to have been given, he was in the habit of lending Naylor money, and the use of his name by indorsements.

Upon this presentation of the case, the judge was asked by the counsel for Osborn to nonsuit the plaintiff, alleging, as a ground of the motion, that there was no sufficient evidence of the genuineness of his signature to the bond. The non-

suit was refused (Osborn excepting), and the judge submitted
the case to the jury, under a charge to which no objection
was made. The legal question, therefore, raised by the excep-
tion was, not whether the evidence of the genuineness of the
defendant's signature was more or less conclusive, but whether
it was so weak, inconclusive, and unsafe as to require the
judge to withhold the cause altogether from the jury. On
this point I am very clearly of the opinion that the judge did
not err, but that, on the contrary, it would have been error
to have granted the nonsuit. There was certainly evidence
of a competent nature tending to prove that the signature was
in the handwriting of the defendant, and there was no fact or
circumstance to lead to an opposite conclusion, except the
denial by Osborn himself, in a qualified way, eight years
afterwards, that he had ever signed the instrument. Par-
sons, who had seen the defendant write on one or more occa-
sions — who had the bond in his possession purporting to have
his signature to it — who testified that he knew the defend-
ant's handwriting at the time, and thought he should know
it at any time if he saw it, swore that he recognized the bond,
whilst in his hands, as a genuine instrument, as being signed
by him (Osborn), Calrow and Naylor, with the handwriting
of all of whom he had more or less acquaintance. This was
quite enough, apart from anything else in the case, to carry
it to the jury on the only really debatable question, viz., the
genuineness of what purported to be Osborn's signature.

The witness had shown himself competent to give an
opinion as to the genuineness of the signature or writing in
dispute. "It is an established rule," says Phillipps, "that if
the witness has seen the person write, he will be competent
to speak to his handwriting." (1 Phil. Ev., 484.) Parsons
had seen the defendant write on one or more occasions about
the time of the alleged execution of the bond in suit, and in
that way and to that extent, as he stated, he became acquainted
with his signature. When he testified that he knew the
handwriting of Osborn, and recognized the bond as being
signed by him, and as a genuine instrument, it was, in sub-
stance, expressing the opinion that what purported to be

Osborn's signature was genuine. The degree of weight his testimony deserved (considering what he said on his cross-examination in regard to his inabilty to discriminate between a genuine and tolerably good imitation of the defendant's signature, and the opportunity he had of inspecting the writing in dispute) was a question for the jury and not the court. At all events, upon the evidence, it would have been error to have excluded from the consideration of the jury the question whether the signature attributed to the defendant was or was not genuine.

The defendant Osborn then interposed no valid exception. It was not error, so far as he was concerned, to submit the case to the jury. But the General Term thought otherwise, and on appeal from the judgment against him, reversed the same and ordered a new trial. This reversal must have proceeded wholly upon the ground that the judge erroneously refused the nonsuit, and not that the court differed with the jury as to conclusions of fact. The question whether the judgment should have been reversed on the facts was not before the court. No motion for a new trial on a case or exceptions was made at Special Term; but the defendant appealed from the judgment directly to the General Term. Where the trial is by jury, the motion for a new trial upon the law and the fact must be made and decided in the first instance at Special Term, and the Code, in such case, only authorizes an appeal upon the law to be taken directly to the General Term from a judgment. (Code, §§ 265, 348.) The General Term was not then in a position to review the case upon the evidence, and sustain or set aside the judgment, and grant a new trial, as it might concur or non-concur with the jury as to the facts established. We are not to intend, therefore, that the reversal was on questions of fact.

I am of the opinion that there was no error of law committed on the trial which justified the reversal of the judgment. The order of the General Term granting a new trial should be reversed, and the judgment of the Special Term affirmed.

POTTER, J. This action was on an indemnity bond, claimed to have been given by the defendant Osborn, with

others, to secure the plaintiff against a mechanic's lien. The mechanic established his lien against the plaintiff. The plaintiff's damages were proved, by reason thereof, to be above $900, for which the jury on the trial rendered a verdict in his favor. The defendant Osborn, only, interposed a defense. The bond sued on was lost, and the only questions on the trial and on the appeal are: 1st. Whether the proof of loss was sufficient to authorize the admission of secondary evidence of its contents; and, 2d. Whether the proof of its execution as to the defendant Osborn, was sufficient in law. The plaintiff had been prosecuted by the mechanic, whose lien was enforced, and on that trial the bond in question was used before the referee, and was handed to one of the counsel on that trial for examination, and had never since been seen. The referee, all the counsel, the plaintiff, Naylor, the principal indemnitor in the bond, one of defendants, were all sworn as to the loss. The judge, at the trial, and the court, at General Term, held the proof of loss sufficient to admit secondary evidence of its contents, and, as I think, correctly. And this brings us to the examination of the second and remaining point in the case, whether the proof of the execution of this bond was sufficient as against the appellant.

In looking at the pleadings in the action, I do not think there is, in the answer, a clear denial, by the defendant, of having executed this bond. The complaint alleges "that the defendants herein, made, executed and duly acknowledged, under their hands and seals, and delivered to the plaintiff, their bond, &c." The only answer interposed to this allegation, by the defendant, is, that he "shows to the court that he denies each and every allegation in said complaint contained, &c." I do not think this is equivalent to a general or specific denial of the material allegation of having made, executed, acknowledged and delivered this bond. He does not deny the making and execution and delivery of the bond, and swear to his denial; but he says that he shows he denies, and swears to the truth of that; that is, he swears that he says he denies. I do not think perjury could be assigned for the falsity of such an affidavit. The affidavit would be true,

that he shows that he denies. This may be too technical a criticism, for it may be that no ingenious evasion was intended; but we ought not, I think, to sanction this as a good precedent for an answer by way of denial of a material allegation, but suppose this to be an unjust criticism.

On the trial there was but one witness called to prove the genuineness of the execution of this bond by the defendant Osborn. This was Mr. Parsons, an attorney and counselor-at-law, who was counsel for Naylor (one of the defendants in this action) in the mechanic lien suit. He testified to having prepared such a bond for execution; that he had it among his papers on that trial; that it then purported to have been signed and executed by three defendants, including Osborn; that he saw it several times during the trial, &c. After a long examination as to its loss, he was examined as to the genuineness of the signature of Osborn, he having said the bond was signed by Naylor, Osborn and Calrow.

Mr. Parsons testified that he had seen Osborn's handwriting on several occasions; that Osborn was at his office and executed one or more papers on several occasions, in behalf of Naylor, in several matters, and his recollection was, that he saw him execute several papers. "Q. Did you know the handwriting? A. I thought I did. Q. Do you say now that you did? A. I think I did know the handwriting of Osborn. Q. You recognized that bond as being signed by him, and by Calrow and Naylor? A. Yes, sir; and by Naylor." The witness further testified: "That was my best recollection, that I have seen Osborn write in my office on one or more occasions when he came to execute papers, and I became acquainted to that extent with his signature at that time, and recognized this at the time as a genuine instrument." Upon his cross-examination, Mr. Parsons testified that he had no recollection how often he had seen Osborn write; that he could not positively say that he had seen him write three times. "Q. Can you say now that you know his handwriting? A. I think I should know his handwriting if I saw it. Q. Could you tell it from a tolerable imitation? A. I am not an expert in signatures; if there

was a good imitation I should call it his, and so of anybody's else.    Q. Are you sufficiently familiar with his handwriting to discriminate between a genuine and a tolerable good imitation of the signature ?    A.   No, sir ; I do not know that I am."

Here was an intelligent witness ; an attorney and counselor-at-law, who had seen the defendant write on several occasions, in his office, in giving his signatures to papers, and in that way, and to that extent, he had become acquainted with his signature, and upon that knowledge expressing a belief of the genuineness of the signature.    This was sufficient in any court to sustain a judgment founded upon it.    True, Osborn was sworn and says he never signed any bonds but those entered upon a memorandum, which he produced, and this bond was not on that memorandum ; but this only created a conflict of evidence which made it necessary to submit it to the jury to determine the truth.    It was so submitted, properly submitted, and the jury found that the defendant had executed the bond.    If this verdict was against the weight of evidence, the true relief should have been applied for to the judge who tried the action upon his minutes for a new trial, on the ground that the verdict was against the weight of evidence.    No such application was made ; but an appeal was made to the General Term, from whose majority opinion, it is seen, that a new trial was ordered, upon the ground that the evidence to prove the execution of the bond was insufficient.

As this must be a question of law, it is to be examined only upon that view.    As a question of law, it can only be presented upon the proposition : Was there sufficient proof of its execution to have that question submitted to the jury ?    The General Term had no right to reverse ; this court will not disturb the verdict, on account of the finding of the jury, if the proof was sufficient to be submitted to them.

I suppose the rule in this regard is, that when a party has offered all his proof upon the point, the question is then presented for the court to rule, whether it is sufficient to go to the jury.    This was done in this case ; the objection was made ; the court decided it to be sufficient.    Was this ruling error ?

Greenleaf, in speaking of the modes of acquiring knowledge of handwriting (Greenl. Ev., vol. I, § 577), says : " The first is, from having seen him write. It is held sufficient for this purpose that the witness has seen him write but once, and then only his name. The proof in such case may be very light, but the jury will be permitted to weigh it." In support of this proposition he cited in a note the case of *Garrells* v. *Alexander* (4 Esp., 37). The witness in that case was called to prove the signature to a bill of exchange ; he had never seen the witness write but once, and that was his signature to the bail bond in the case. He was asked his belief as to the genuineness of the signature to the bill in question. He said he could form no belief ; it was like the handwriting on the bail bond. He was about to compare them, and Lord Kenyon refused to allow him to do so, and told him he must form his judgment without comparison of hands. The witness again looked at the bill of exchange, and said it was like the handwriting on the bail bond, but could speak of no other belief than he had expressed. It was objected that this evidence was not sufficient, and would be of dangerous consequences to allow such loose evidence of handwriting to charge a party with a debt. Lord Kenyon said : " I think there is evidence to go to the jury, and that I am bound to leave it to them."

Phillipps, in his Treatise on Evidence, 365, speaking of this kind of proof, says : "Like all probable evidence it admits of every possible degree, from the lowest presumption to the highest moral certainty." But whatever degree of weight his testimony may deserve, which is a question exclusively for a jury, it is an established rule, that if he has seen the person write, he will be competent to speak to his handwriting."

In *Eagleton* v. *Kingston* (8 Ves., 473, 474), Lord Eldon discusses the rule in chancery (in the year 1803), which he said was the same in courts of law. After repudiating, as authority, some late cases, which had admitted of evidence by comparison of handwriting, he says the later cases have brought the law back to what it was twenty-five years ago, which was :

"You called a witness and asked whether he had ever seen the party write. If he said he had, whether more or less frequently; if ever; that was enough to introduce the subsequent question, whether he believed the paper to be his handwriting. If he answered, he believed it to be so, that was evidence to go to the jury."

Cow. & Hill, in note 913, lay down this proposition: "If the witness' knowledge appears to have been derived from proper sources, its degree respects the credence to be awarded to what he says, rather than its competency." This is, doubtless, the true rule, and the question of credence is a question which a jury, and not the court, should determine. I am not aware of any change in the rule as established by the authorities above cited. The plaintiff produced competent evidence to be submitted to a jury; it was his right to have that body pass upon that question, and it was so submitted and passed upon according to the long established and uniform practice of the courts; the finding of the jury upon the fact on a review is conclusive. It was, I think, an unusual and improper exercise of power by the General Term to reverse that finding. I am, therefore, of opinion that the judgment of the General Term should be reversed.

Judgment of the General Term reversed, and a judgment on the verdict ordered.