# Court of Appeals.

February 18, 1896.

## PEOPLE v. MICHAEL COREY.

**1. EVIDENCE—HANDWRITING.**

Before the witness should be permitted to testify to the handwriting of another, he should be acquainted and somewhat familiar with the hand writing of such person.

**2. Same—Admissions.**

Statements of the defendant, which merely raise a suspicion or conjecture as to an alleged fact, do not amount to an admission and cannot be acted upon by the court in determinating his rights.

**3. Same—Handwriting.**

The effect of c. 36 of 1880, as amended by c. 555 of 1888, is to permit the admission in evidence of only such writing as have been proved to the satisfaction of the court to be in the genuine handwriting of the person claimed to have executed the disputed instrument.

**4. Same—Irrelevant.**

Where there was no necessity for showing defendant's physical condition, to establish the fact that he was to engage in the affray which resulted in the homicide, the court should not permit a witness, even though he has, on cross examination, testified that the defendant was sick at the time in question, to give testimony as to the particular nature and character of the disease with which he was afflicted.

**5. Appeal—Harmless Error.**

Illegal evidence, which has a tendency to excite the passions, arouse the prejudices, awaken the sympathies or warp or influence the judgment of jurors, in any degree, cannot be considered as harmless.

**6. Trial—Charge—Intoxication.**

A charge to the jury, involving the question of the defendant's intoxication at the time of committing the act, is erroneous, where the impression may have been left in the jury's minds that, if the defendant was intoxicated so as to be unable to distinguish between right and wrong, the fact of his intoxication was not to be considered by them in the determination of his case.

**7. Same.**

Such charge is erroneous also where it does not state the rule to the jury with sufficient clearness to enable them to understand that the defendant's intoxication might be considered by them in determining the grade or degree of his crime.

**8. Court of Appeal—Section 528 of Criminal Code.**

The provisions of § 528 of the Code of Criminal Procedure were not intended to confer upon the court of appeals the right to disregard any valid exception taken by defendant, or to abridge any rights he formerly possessed in reviewing the rulings of a trial court.

**9. Appeal—Reversal.**

Section 542 of Code of Criminal Procedure in no way impairs or affects the previously well established principle that the rejection of competent and material evidence, the reception of incompetent and improper evidence, which is harmful to a defendant, and excepted to, presents an error requiring a reversal.

Appeal from a judgment convicting defendant of murder in the first degree.

Albert O. Briggs, for appellant.

Joseph D. Senn and M. H. Kiley, for respondent.

MARTIN, J. The defendant appeals from a judgment of the Madison oyer and terminer, entered upon the verdict of a jury, convicting him of the crime of murder in the first degree. The evidence discloses that the defendant stabbed James George, an Indian, with a knife, or some other sharp instrument, and that the wound thus inflicted caused his death. The defendant was known by the name of Michael Kelley, as well as by the name of Michael Corey. The assault which resulted in the Indian's death occurred in the evening of the 27th of September, 1894, at the house or place where Frank Webb and his family then resided, in the town of Eaton, Madison county, N. Y. At and prior to the time of the affray the defendant had been living or boarding with the Webb family, and had made it his home with them, more or less, for about one year. There were present at Webb's, when the affray occurred, the defendant, the decedent, Cora Bennett, and Webb's family, which consisted of himself, his wife, and six children, who were from 1 to 17 or 19 years of age. The place where Webb resided was a mere shanty, consisting of one room, 12 by 16 feet, with one small window and a door. There was but little furniture in the room. On the day of the homicide the defendant had been assisting Webb in putting up a woodshed, or lean-to, adjoining the house or shanty, and had been there during the entire day. The decedent stayed at Webb's the previous night, but had been absent during the day, and returned at about 7 o'clock in the evening. The evidence tends to show that all the persons present when the decedent was stabbed were more or less intoxicated, with the exception of Webb and his younger children. During the afternoon and evening two jugs of beer, a quart of whisky, and a pint of alcohol had been furnished; and all had been drank by the persons there, except a portion of one jug of beer, and a pint of whisky. The evidence also tends to show that the decedent was a stong, healthy Indian, of a somewhat quarrelsome character,

while the defendant was not in robust health, and was usually a quiet and peaceable man. When the decedent returned to Webb's house, in the evening of that day, he brought with him some provisions for the family, a portion of which Mrs. Webb cooked for his supper. The defendant, at the invitation of the decedent ate with him. During the evening, a portion of the time before the homicide had been spent in dancing. Shortly before the affray the defendant had complained of the decedent for sitting upon a bed on which some of the girls were lying. He also expressed to Mrs. Webb a feeling of hatred for the decedent, his design to have revenge upon him, and declared that he "would lick him if it cost his life to do it." About the time the encounter took place, the decedent was talking with Susan Webb, when the defendant said to him, "What do you talk to her for?" To which the decedent replied, "Ain't I a right to talk to this girl?" The defendant then jumped up, saying: "No, you ain't [ calling the decedent a vile name ]. I will fix you;" at the same time striking him with his fist. Whether the decedent simply warded off the blow, or struck the defendant a blow in return, is not entirely clear, but the evidence tends to show that he simply warded it off. Immediately following this, the defendant struck and stabbed the decedent six or seven times with a knife, or some other sharp instrument,—probably a small knife belonging to one of the Webb girls—and immediately left the house. The decedent attempted to sit upon a chair, but fell upon the floor, and was then discovered to have been stabbed. The defendant shortly left the county of Madison, went to New York, and when arrested, was found at a hospital on Blackwell's Island. The decedent lived until about the 4th day of October, 1894, when he died from the effects of the injury inflicted upon him by the defendant. No other or further statement of the facts preceding or surrounding this transaction need be made, to present the questions involved.

On the trial a letter and two envelopes were offered in evidence. They were objected to by the defendant upon the grounds that they were incompetent and inadmissible, that no foundation had been laid for the evidence, and that they were not properly proved or shown to have been written by the defendant. These objections were overruled, and the letter and envelopes were admitted

in evidence. To this ruling the defendant excepted. The letter was as follows:

"New York City, Sunday, October 21st, 1894. Dear Susie: I thought I write you these few lines, hoping they may find you and all the rest of the family in good health, and getting along good. Susie, I can't tell you how sorry I am for getting in that trouble, and having to leave you; but you are as much to blame as I am, for if you hadn't carried on the way you did that night I would not have got fighting with that G——d d——n Indian, but never mind; it may be all for the best, Susie. After I had that trouble that night, I went down to Ira Spaulding's, and stayed there until morning, and was going to work for him that day; but I was afraid Jimmie would get a warrant out for me, so I made up my mind the best thing I could do was to come to New York until it would blow over. Susie, I can't tell you how lonesome I am without you, and how I long to be back home with you and mother again; for, Susie, I always looked on your mother as my own, and she always treated me like if I was her son; and we would have got along all our life without a word, only for that Jimmie coming there. Well, Susie, I don't do anything yet. I am living with my brother, since I came to New York. As he is pretty well off, now, I have anything I want from him; but I expect to get a good job soon, and if I do you will hear from me. Well, Susie, I was telling my brother about you, and that you wanted him to come out and see you, but he wouldn't leave the city for anything, as he said he would die if he had to live as we live up there. Well, Susie, I want you to get some one to write a letter for you to me, and let me know how you are all getting along, and if Jimmie made much of a fuss over that trouble, and if everything is all right. Now, if you don't want to get any one to write for you, why write yourself, if it was only two words, for I long to hear from you, Susie. Although you are 300 miles away from me, I am always thinking of you, both night and day. You are always in my thoughts. Remember, Susie, I love you with all my heart, and shall never forget the way you treated me, let it be good or bad. Remember, also, that I have often told you that I would kill any one that would come between us; and so, Susie, so help me God, I will, and that is why I cut Jim with that knife.

I meant to kill him, and will, if I didn't, if he ever comes monkey-ing around you again while I am there, the G——d d——n big Indian bum.   I was always down on him for putting his hand up little Mary's clothes.   I had a right to get him arrested right there, then, G——d d——n him ; but I will say no more now, but will now close, hoping to hear from you soon.   Susie, tell your mother, and all the rest of the family, I was asking for them, and send them my love.   Susie, kiss little Gertie for me.   Susie, I will send you an envelope already addressed, so all that you will have to do is to write your letter and post it, and I will get it all right.   Be sure and write soon, as I long to hear from you.         Mike XXX.

" Tell Libbie I was asking after her. "

The envelope in which this letter was inclosed had upon it the following address :   " Mr. Frank Webb, care of Mr. Lewis, Postmaster, Pratt's Hollow, New York, "   It was postmarked, " New York, Oct. 22d, 10 a. m. "   Inclosed with the letter was an envelope directed, " Mr. Hugh Foley, 53 Bowery, Phœnix House, N. Y. "

The only evidence upon the trial tending to show that the letter or the envelopes received in evidence were written or addressed by the defendant was the testimony of Frank Webb and Susan Webb, and certain statements proved to have been made by the defendant.   Frank and Susan Webb testified they had seen the defendant write, and that the letter was in his handwriting, and Frank Webb testified that the envelopes were addressed by him, while Susan testified that they were not.   The admissions claimed to have been made by the defendant were made shortly after his arrest in the city of New York.   To fully understand the nature and extent of this evidence, and to determine the effect that should be given to it, it is necessary to examine it somewhat in detail. Frank Webb testified upon his direct examination that he had seen defendant write; that he knew his handwriting; that he could read his writing,—could read it better than any one else's; that he saw Kelley sign his name, " Michael Kelley, " in the Testament ; that he wrote his name " Michael Kelley " ; and that he wrote the words " Mr. Frank Webb " in the Testament.   He then testified he did not know as he saw him write anything in the Testament except his name, which was printed in Roman letters, and finally

said he did not see him write any more. He was then asked if the letter and the two envelopes mentioned were in the handwriting of the defendant. This was objected to as incompetent, inadmissible and that the witness was not shown competent to judge. The objection was overruled, and he testified that they were. On his cross-examination he stated distinctly that he never saw the defendant write, except to print his name in the Testament. When his attention was called to the envelope contained in the letter, which he had already testified was in the handwriting of the defendant, he was able to read correctly but a single word of the entire address, which contained ten words and figures, and testified that "New," as a part of the word "New York," was fully written out, when it was abbreviated, there being only the letters "N. Y." On the envelope addressed to himself he was able to read only his own name. Without going into further detail, a careful examination of the evidence of this witness bearing upon the subject of his competency to give an opinion as to the defendant's handwriting renders it manifest that he was practically unable to read writing, to write, or to distinguish words written, and that he had never seen defendant write his name, but only saw him print it in the Testament offered in the evidence. It is quite obvious that the opinion of this witness was worthless and of no value in determining the question whether the letter introduced was written by the defendant. The only other person who testified to his handwriting was a daughter of the last witness, who was about sixteen years of age. She testified she knew the defendant's handwriting; that she could read writing a very little; that saw him write in the Testament; that the latter was in his handwriting, but that neither of the envelopes was addressed by him although her father had testified they were. On her cross-examination she admitted she could not read writing very much, and when asked to read what was upon the third page of the Testament, where she claimed the defendant had written, she was unable to do so. Her evidence seems to be equally as valueness as that of her father. Here was a girl who practically could neither read nor write,—at most, could read but little, and write less. There is nothing whatever in her evidence to show that she had ever in any way become familiar with writing, or reading the

the writing of others.   Nor was she shown to have had any know-
ledge of the defendant's handwriting, except from having seen
him write in the Testament produced.   The letter and envelopes
thus received in evidence were of vital importance.   As evidence,
they were very damaging to the defendant, if not substantially
controlling, especially to establish the elements required to consti-
tute the crime of murder in the first degree.   To permit evidence
of this importance to be read before a jury, with only such proof
of its genuineness, seems to me to be totally inconsistent with
proper and safe administration of the law.   Before a witness
should be permitted to testify to the handwriting of another, he
should be acquainted and somewhat familiar with the handwriting
of the person whose writing is sought to be provided   He should
have an intelligent acquaintance with the handwriting of the party,
so that he can determine with a reasonable degree of certainty
whether the writing offered is his genuine handwriting.   It seems
very clear that neither of these witnesses had any such knowledge
of the writing of the defendant, or any such acquaintance with it,
as qualified them to give an opinion upon the question whether
this letter and these envelopes were written by him.   An examina-
tion of the evidence of these witnesses shows that they possessed
little natural intelligence, were ignorant, illiterate, had little know-
ledge of the art of writing, or of reading it, and little appreciation
of the responsibility which rested upon them, as witnesses, when
giving evidence as to the handwriting of the defendant.   The posi
tive certainty with which they testified to their knowledge and
qualifications to give an opinion upon that subject, when their
subsequent testimony disclosed that they had little or no know-
ledge of it, tended to show a carelessness and indifference as to
the accuracy of their testimony which clearly indicated that but
little, if any, reliance could be placed upon their evidence.

But it is contended by the respondent that the letter was suffi-
ciently proved by the admissions of the defendant, and hence, if
the evidence of these witnesses should be disregarded, the letter
was properly received.   The learned district attorney insists that
the evidence of the witnesses O'Brien and Lawlor shows that the
defendant admitted to them that he wrote this letter; that such
admission was binding upon him, and was sufficient to justify the

court in receiving the letter in evidence. It therefore becomes necessary to examine the testimony of these witnesses, to determine whether it was of the character and the effect claimed for it by the respondent. The witness O'Brien, in effect, testified that he was a detective in the city of New York; that he arrested the defendant; that after his arrested he heard a conversation between the defendant and the witness Lawlor, in which the defendant asked Lawlor if he thought "that letter amounted to anything;" that Lawlor said, "You must have been a fool, if you thought somebody would call for that letter;" that the letter was to be answered and called for at 53 Bowery, N. Y.; and that the defendant then said Lawlor, "Do you think I can play crazy on them?" To which said," "You must do something better than that." The witness Lawlor was then called and testified: "I had charge of him [defendant] while Mr. O'Brien and the sheriff were at the judge's desk, waiting to have him delivered over to the sheriff. He said to me: 'Can I send a message—' He says, 'Can I send a message to my brother?' I says, 'I guess.' So I called O'Brien. I says 'This man wants to send a message to his brother.' He says, 'All right.' He gave him a piece of paper and a pencil, and he wrote down the name, 53 Bowery, Phoenix House. I says, 'That is where the envelope was in that letter that you spoke about to that girl, was it? He says, 'Yes; that is the letter that got me here.' I says, 'No; we had you locked up before we got that letter at all.' He talked a few minutes more. Again he says, 'Can I play crazy act on that letter?' I says, 'Did you write it like a crazy man when you wrote it?' He says, 'No; does it read like crazy?' 'Well,' he says, 'no.' I says, 'That wouldn't do you any good.' So in a minute the judge had turned him over to the sheriff, and went off. That is all there was of that conversation." On his cross-examination the witness testified that he did not show him any letter or any envelope, and there is no proof or pretense that the letter or envelopes were present at the time. This was substantially all the evidence given by the witnesses O'Brien and Lawlor bearing upon this subject. We do not find in it any proof that the letter referred to was the one introduce in evidence. It will be observed that in all the statements made by the defendant to these officers, or by them to him, no particular letter was men-

tioned, or sufficiently described to identify it; no particular girl was mentioned as the one to whom the letter spoken of was sent; nor was the substance of it in any way identified, except that it contained an envelope as he directed his message. A mere reading of this evidence clearly shows that there was no such identification of the letter referred to in that conversation as to render the evidence of these witnesses proof of an admission by the defendant that he wrote the letter received in evidence, or that he had any connection with it. It may be these facts were sufficient to raise a suspicion or conjecture that the letter referred to by him was the one received in evidence. But that was not sufficient, as suspicion is not proof, nor conjecture evidence, upon which courts can act in determining the rights of parties. In Shaver v. Ehle, 16 Johns. 201, where a person called upon the maker of a note payable to A. or bearer, and demanded payment, but neither showed the note nor mentioned the amount or date, and the maker acknowledged that he had given a note to A. and would pay it at a future day, it was held that that was not a sufficient admission of the existence of the note. In Minard v. Mead, 7 Wend. 68, it was held that evidence of an admission by a party that he authorized another to give a note to a third person, for a specified sum, would not warrant the reading in evidence of a note corresponding with the note thus authorized to be made, without proof of its having been duly made. Again, in Palmer v. Manning, 4 Denio, 131, the evidence to prove the making of a promissory note purporting to be signed by the defendant, and payable to bearer, was that the plaintiff's agent called on the defendant, with the alleged note in his pocket, which he did not exhibit, and told him he had a note for that amount against him, which he wanted payment of for the plaintiff; and the defendant said he had given such a note, and would pay it if the plaintiff would make a small deduction, and indulge him as to time; and it was held that the note produced on the trial was not identified with that to which the admission referred, and that the proof was insufficient. These cases were considered in Bardin v. Stevenson, 75 N. Y. 164, 168 and the latter case distinguished. Their correctness was, however, in no way questioned, but they were substantially approved. The same doctrine was also held in Glazier v. Streamer, 57 Ill. 91, 93.

It seems to me the doctrine of the cases cited is applicable to the question under consideration, and sustains the conclusion that the evidence of the witnesses Lawlor and O'Brien was insufficient to establish any admission by the defendant that the letter introduced in evidence was written by him. If the rule stated in the cases cited was applicable in an action arising upon a contract where only a few dollars were involved, surely it should apply in a case like this, where the question is of such importance, and the evidence so conclusive in its character. It may, however, be said that, as the Testament was received in evidence, the jury may have compared the writing in the letter with the name written in the Testament, and hence there was some evidence that the letter was written by the defendant. As it was wholly immaterial to any issue in the case, the only ground upon which the Testament could have been received in evidence was for the purpose of comparison with the writing upon the letter and envelopes. The effect of the statute which permits the introduction on a trial of other writings, for the purpose of comparison, is to permit the admission in evidence of only such writings as have been proved to the satisfaction of the court to be in the genuine handwriting of the person claimed to have executed the disputed instrument. Laws 1880, c. 36, as amended by Laws 1888, c. 555. An examination of the record in this case disclose that the court admitted this Testament, not as the genuine handwriting of the defendant, but as his handwriting alleged to be genuine. Until its genuineness was established to the entire satisfaction of the court, it was not admissible for the purpose of comparison, and, for the reasons suggested as to the testimony of the witnesses swearing to its genuiness, the trial court may well have characterized it as alleged to be genuine, instead of being genuine. It may be the evidence was technically sufficient to justify the admission of the letter and envelopes, still we think stronger proof of their genuineness should have been given.

There was another item of evidence which was admitted under the defendant's objection and exception, which we think was improperly received. As the respondeut claims that this evidence was proper, because the defendant had opened the door for its admission by interrogating the witness as to the defendant's health,

it is necessary, at the outset, to ascertain how the question arose. On the cross-examination of the witness Frank Webb, in answer to the question asked by the defendant's counsel, whether that night the defendant ate any supper, the witness answered, 'I don't know whether he eat supper or not," and then volunteered this statement: "He couldn't eat much, anyway. He was sick. There was lots of times he couldn't eat nothing." When asked if he knew what ailed him, he replied, "I did pretty near, too, I had it." He then testified that he knew the defendant was sick, and had been for some time. This was the only evidence upon this subject given by the witness upon the examination by the defendant's counsel. Subsequently, upon his re-examination by the people, he was asked, "What was the matter with him?" This question was objected to as incompetent and immaterial. The court then said, "They have a right to show whether he was in a condition to make this affray." The question was then asked: "What was the matter? What was there about it?" The witness replied, "I don't really like to tell," when the court remarked to the witness, "whatever was the matter with him, tell it frankly." His answer was to the effect that he was seriously afflicted with syphilis. The court then observed, "Then he was not entirely well." The witness answered, "I guess not." That this evidence was competent or material upon any issue in the case cannot be pretended. There was no necessity for showing his physical condition, to establish the fact that he was able to engage in the affray which resulted in the homicide. That he did engage in it, and stabbed the decedent, was proved, and not denied. All the facts connected with it had been proved by a number of witnesses. The evidence given in no way tended to show that the defendant was in a "condition to make the affray." It could not have been intended for that purpose. Proof of the particular character of the disease with which the defendant was afflicted could in no way answer any proper purpose. The only effect it could possibly have had was to arouse the passions of the jury, and to prejudice them against the defendant. That such would be its natural and almost necessary effect, no one having been long connected with the trial of actions can for one moment doubt. It could be helpful for the people's case only so far as it unjustly and improperly

prejudiced the jury against the defendant, and was therefore harmful to him. It is a well-established principle that illegal evidence, which has a tendency to excite the passions, arouse the prejudices, awaken the sympathies, or warp or influence the judgment of jurors, in any degree, cannot be considered as harmless. Anderson v. Railroad Co., 54 N. Y. 334; Hutchins v. Hutchins, 98 id. 56, 65. We think that the learned trial judge should not, under the circumstances, have permitted the witness to give testimony as to the particular nature and character of the disease with which the defendant was then afflicted.

The defendant contends that the question of his intoxication was not properly submitted to the jury. He insists that the instructions of the court were such as to lead the jury to believe that, unless he was so far intoxicated as to be unable to distinguish between right and wrong, they could not consider his intoxication, even upon the question of motive or intent, or in determining the degree or grade of the crime of which he should be convicted. Upon the subject of the defendant's intoxication, the court gave the following instructions: " Gentlemen, there is another question which you may take into consideration in this case, and it is an important one: Were these men engaged in a drunken brawl or fight? Now, you must not get the idea, gentlemen, that intoxication, unless it is a total intoxication, and it is conceded on all sides that the defendant was somewhat under the influence of liquor (but it make no difference how far George was under the influence of liquor; he is not the one); but if the defendant was wholly irresponsible from intoxication, then he might not be credited even with making an attack. The defendant would have a right to say that he was doing what he knew nothing about, if he did make the attack, and he would have a right to make a certain self-defense, within the line which I have given you. But another provision comes in here, and that is this: It is not an excuse for a man who deliberately gets drunk, who voluntarily gets intoxicated, to commit a crime. He cannot be excused from that crime. He cannot be and ought not to be, unless the drunkenness goes so far, and to such an extent, that the man did not know what he did. A very good illustration of it was in the evidence of one of these Indians who took the stand. He said an

attack was made by George, and after the attack was made he
says he was perfectly oblivious to everything that was going on,
because he was so drunk.    Now, if a man was in that condition,
and made an attack, he could not be convicted of crime, a man
must know, he must intend, he must have mind enongh left sit-
ting upon the throne of reason, he must have intelligence enough
left, and intention left, that he knows the difference between right
and wrong.    But simply because a man is drunk, and engorged
with liquor, which he has voluntarily taken, is no defense to
crime, and section 22 of the Penal Code defines that rule: 'No
act committed by a person while in a state of voluntary intoxica-
tion, shall be deemed less criminal by reason of his having been
in such a state or such a condition.    But whenever the actual ex-
istence of any particular purpose, motive or intent is a necessary
element to constitute a particular species or degree of crime, the
jury may take into consideration the fact that the accused was in-
toxicated at the time in determining the purpose, motive and in-
tention with which the act was committed.'    Now, if he was not
drunk enough so but that he had a motive, and he had an intent,
that he formed a purpose to do the act, then it is no excuse.  You
have a right to take into consideration his intoxication, for the
purpose of seeing whether he could be convicted of murder in the
first or second degree, or in one of the degrees of manslaughter;
and upon the question of intent, upon the question of motive, he
would have a right, under those circumstances, to the benefit of
the doubt, and you would be justified and authorized in convict-
ing him in a lesser degree.    But, gentlemen, you must not do this
upon the theory to let him off.    You must only do it if you be-
lieve that he was so drunk that he did not form a motive, that he
could not form a motive; and upon that question you have the
right to take into consideration all that he said and all that he ad-
mitted about it, the number of blows that were struck, and the
way he acted, including his escape, for the purpose of saying
whether he appreciated what was going on, and whether he was
drunk enough or sober enough to know that he had committed
this injury, or that he was committing it.    Gentlemen, a very re-
spectable authority, People v. Mills, 98 N. Y. 176, holds that in-
toxication does not preclude premeditation, because a man may

premediate and design and deliberate when he is drunk. He may not do it consecutively and accurately, yet he may be fired up under the influence of liquor and the excitement, so that he is better prepared to do it, and better prepared to deliberate. So you are to take into consideration that proposition."

This portion of the charge shows that the jury were, in fact, instructed that if the defendant was totally intoxicated, so that he did not know right from wrong, it was an excuse for his crime. This statement was repeated several times, and illustrated in the charge by calling attention to the evidence of one of the defendant's witnesses. The judge then charged that voluntary intoxication was no defense to crime, and read to the jury section 22 of the Penal Code. After having read that section, he instructed them to the effect that if the defendant was not sufficiently intoxicated, so that he had no motive or intent, his intoxication was no excuse. Whether by this he intended to instruct the jury that the defendant's intoxication was no excuse, either partial or complete, or that it was not a complete excuse, is by the charge left in doubt. He then stated to the jury that they might consider the defendant's intoxication, upon the question of intent or motive, in determining the grade of crime. Having previously told the jury that only total intoxication was an excuse, it is not clear that the jury understood that partial intoxication might be considered in determining those questions. This was followed by a statement that upon that theory the jury must not let the defendant off; that they must only do it if they believed that he was so drunk that he did not form a motive. Whether by this last statement the court intended to instruct the jury that they must not let the defendant entirely off unless he was so drunk that he could not form a motive, or whether the purpose of this portion of the charge was to instruct them that they should not consider the question of the defendant's intoxication unless he was so far intoxicated that he could not form an intent or motive, is not very clear. It may be that the jurors understood from this charge that they might consider the fact of the defendant's intoxication in determining the grade or degree of the crime, even if he was not so intoxicated as to be unable to distinguish between right and wrong; and yet it is quite as probable the impression may have

been left in their minds that, if the defendant was not intoxicated to that extent, the fact of his intoxication was not to be consid-ered by them in the determination of the case. Very likely a trained legal mind would interpret the instructions of the court as permitting the consideration of partial intoxication upon the ques-tion of motive or intent. But we think it is equally probable that the jury may have understood from the charge that no intoxica-tion short of that which would render the defendant unable to en-tertain a motive or form an intent could in any way affect the de-fendant's guilt, as to degree or otherwise. The peculiar language of this charge is such that at least it may have misled the jury. The charge in this case is similar in some respects to that in People v. Leonardi, 143 N. Y. 360, 38 N. E. 372, where this court re-versed the judgment on the ground of the insufficiency of the charge. We are fearful that the learned trial judge did not state the rule to the jury with sufficient clearness to enable them to un-derstand that the defendant's intoxication might be considered by them in determining the grade or degree of his crime.

It is provided in section 528 of the Code of Criminal Procedure that the court may order a new trial if it is satisfied that justice requires it, whether an exception shall have been taken or not. We do not understand that the provisions of that statute were in-tended to confer upon this court the right to disregard any valid exception taken by a defendant, or to abridge any rights he for-merly possessed in reviewing the rulings of a trial court. The manifest purpose of its provisions was to throw additional safe-guards around a defendant, where the judgment is of death, by permitting this court to award him a new trial, if satisfied that jus-tice requires it, although no exception shall have been taken in the court below. People v. Driscoll, 107 N. Y. 414, 14 N. E. 305. The only statute that authorizes the court to disregard errors com-mitted on a trial in a criminal action is section 542 of the Code of Criminal Procedure, which provides: "After hearing the appeal the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties." This statute is, in effect, but little more than a codification or statutory enactment of the previously estab-lished rule, that even in criminal cases a new trial will not be

granted for an erroneous ruling, where the appellate tribunal can see that by no possibility could the error have worked any harm to the defendant. Stokes v. People, 53 N. Y. 164. This statute in no way impairs or affects the previously well-established principle that the rejection of competent and material evidence, or the reception of incompetent and improper evidence, which is harmful to a defendant, and excepted to, presents an error requiring reversal. Such a ruling affects a substantial right of a defendant, even though the appellate court would, with the rejected evidence before it, or with the improper evidence excluded, still come to the same conclusion reached by the jury. The defendant has the right to insist that material and legal evidence offered by him shall be received and submitted to the jury, and to have illegal and improper evidence, which may be harmful, excluded, and to have the opinion of the jury taken upon proper evidence admitted in the case, and upon such evidence only. People v. Wood, 126 N. Y. 249, 27 N. E. 362; People v. Greenwall, 108 N. Y. 296, 15 N. E. 404. As was said by Earl, J., in the latter case, "A person on trial for his life is entitled to all the advantages which the laws give him, and among them is the right to have his case submitted to an impartial jury upon competent evidence." After carefully examining and considering the evidence, the rulings, and the charge contained in the record before us, we have become satisfied that justice requires us to grant the defendant a new trial in this action. In reaching this conclusion, we have not been wholly controlled by any one of the questions discussed, but upon a consideration of them all, we have been led irresistibly to the conclusion that in the furtherance of justice a new trial should be granted.

The judgment must therefore be reversed, and a new trial granted.

HAIGHT, J. ( dissenting ).—The deceased, James George, was an Indian, about 40 years old, engaged in the business of bottoming chairs, and from time to time was a visitor at the residence of Frank Webb. The defendant, Michael Corey, was born in the city of New York, and was there known by the name of Corey; but during the summer of 1894 he had been engaged as a farm

laborer for one Ira Spaulding, living in the town of Stockbridge in the county of Madison, and he was there known by the name of Kelley. About the 1st of September he stopped working for Spaulding, and entered the employment of one Frost, and engaged in picking hops. During this time he boarded with Webb. Webb appears to have been a man in humble circumstances, living in a shanty situated in a swamp surrounded by bushes, about one-half of a mile from the public highway. The shanty contained only one room, 12 by 16 feet in size, in which the family lived, ate, and slept upon bedding lying upon the floor. There was one window in the west side, one door in the south side, and a little shelf or mantelpiece on the south side, just east of the door, about as high as the head of an ordinary adult. The Webb family consisted of himself, his wife ( Sarah Webb ), three daughters ( Libbie, aged 19 years ; Susan, aged 16 years ; Mary, aged 9 years ), and two smaller children. On Thursday evening, September 27, 1894, there was present, beside the family, Cora Bennett, aged 19 years, James George, and the defendant. The defendant had been there during the day, and had assisted Mr. Webb in the construction of a lean-to on one side of the shanty. George had been there in the morning, had procured some material for the repair of chairs, and had gone to the village of Morrisville. He returned about dusk, bringing with him a quantity of sausage and beef, from which Mrs. Webb cooked his supper. After awhile the defendant suggested that, in view of having visitors, they ought to have some beer. Thereupon Frank Webb went to Pratt's Hollow, where he procured a quart of beer and two pints of whisky. He returned about 8 o'clock in the evening. While he was away, George took a pint of alcohol which he had brought with him, and, reducing it with an equal quantity of water, placed the mixture in two pint bottles, which was passed around among the company. After the return of Webb, the beer was also passed around each drinking a little, but leaving about half; and then one of the pint bottles of whisky was passed around, after which Mr. Webb played on his violin while the company danced. George danced with Mary and Susan. The defendant danced with Mrs. Webb and Susan, and some of the other girls. After the dance had ceased, and about half-past 10 o'clock in the evening,

the defendant was sitting in his shirt sleeves on the north side of the room, near Mrs. Webb. Susie Webb was standing near the shelf, next to the door, and George stood by her side, talking to her. The defendant then stepped up to them, and says to George, 'What do you talk to her for?" George says, "Ain't I a right to talk to this girl?" The defendant says, "No, you ain't, you son of a bitch," and struck George with his fist. George then pushed him back against the wall, and the defendant then sprang back again at him, striking him several times about the body, and then ran out of the door. George staggered towards a chair, but fell from it onto the floor. Webb then undertook to pick him up, but found that he was covered with blood. He then followed the defendant out of the house, and found him in the edge of the woods, and had some conversation with him in which the defendant stated that he had cut George with the little blade of a knife, and stated that he had thrown the knife back behind the woodshed, in the bushes. He then wanted his hat, coat and vest, and Webb returned to the house, got his clothes for him, handed them to him, and he went away. Webb then returned to the house, and found George groaning and in great apparent agony. He bathed some of the wounds, discovered by him, in whisky and salt, took such care of him as he could, until it began to grow light, and then he went to the village, and procured the attendance of Dr. Clark. The doctor arrived between 5 and 6 o'clock in the morning, and then found George suffering from a wound an inch and a half in length, penetrating the pleural cavity; two wounds penetrating into the muscles; one over the stomach; one lower down in the abdomen, from which the omentum protruded; one near the hip bone; one cut above the elbow joint, $2\frac{1}{2}$ to 3 inches long; one in the hip, that went in about $1\frac{1}{2}$ inches, and one or two small wounds, —in all, nine in number. The doctor dressed the wounds, and took charge of the case from that time until the seventh, the day when George died. The cause of death was the wound that penetrated the pleural cavity. The defendant, after leaving the residence of Webb, went to Spaulding's, where he had formerly worked, and slept in the barn overnight. The next morning he had a talk with one or two individuals, in which he stated that he had a fight the night before with the Indian, and had stabbed him three or

four times. He then disappeared, and was not heard from until the latter part of October, at which time a letter from him to Susie arrived, to which allusion will be made hereafter. The officers then found him in the hospital on Blackwell's Island, and procured his arrest.

Upon the trial the facts were undisputed. Passing the details of the affray, the first questions that arise, requiring careful and considerate attention, are those pertaining to motive and intention, and the deliberation and premeditation with which the act was done. It appears that George was a widower, and had been giving considerable attention to the girl Susie; that the defendant was also enamored of her, and had asked her to become his wife; that a day or two before they had attended a circus in company with Mrs. Webb and her two daughters, Libbie and Susie, and that in returning from the circus the defendant and George had a quarrel, and were about to engage in a fight, when Mrs. Webb interfered and led the defendant away. Again, it appears that on the evening of the affray the defendant became extremely jealous of George, and made threats against him. A half or three-quarters of an hour before the final affray, Susie sat down upon the beds, which were piled up in one corner of the room, with back against the wall. Libbie and Cora were lying upon the bed. George sat down upon the beds, by the side of Susie. The defendant was then sitting in a chair on the other side of the room. He then said to George: "If you was any kind of a man about you, you would come up here and sit with the men. You wouldn't be sitting there." To which George replied. "Ain't I got any right to sit here?" The defendant says, "No." They then got up, and were preparing to fight; but the girl Susie interfered, and for a time they were quiet. The defendant, however, took a seat by the side of Mrs. Webb, to whom he remarked "that he hated that black, damned Indian, and he wanted to have his revenge on him, and he would, some time or another." He said "he would lick him, if he could have trouble with him." And, again, "he would lick him if it cost him his life to do it." As we have seen, about a half an hour thereafter Susie and George were again engaged in conversation at the mantel, at which time the final affray, already related, took place. The letter, to which allusion has already been

made, is set forth in the prevailing opinion.   See 42 N. E. 1067. This, in substance, is the evidence bearing upon the questions referred to.   It will be seen that there was evidence of jealousy, which often forms one of the stongest motives for the commission of crimes of this character, ill feeling, threats, an opportunity to deliberate and premeditate, together with the written declaration that he ment to kill.   Seldom is evidence present more convincing or conclusive.   It is not only sufficient to warrant the finding of the jury, but amply sustains the verdict.

The only exceptions appearing in the case requiring special attention pertain to the reception in evidence of the letter above referred to.   In the latter part of October, after the death of George, there arrived at Pratt's Hollow post office a letter addressed to Mr. Webb, care of Mr. Lewis, the postmaster, stamped, "New York, October 22nd."   This letter was taken from the post office by the undersheriff, and taken to Mr. Webb's house.   It was opened, and there was found inclosed the letter which we have given above, together with an envelope, with a postage stamp thereon, addressed, "Mr. Hugh Foley, 53 Bowery, Phœnix House, N. Y." This letter was the first disclosure to the Webbs of the whereabouts of the defendant.   It was taken in charge by the undersheriff, and was subsequently produced upon the trial, after being indentified as the letter found inclosed by Webb on the occasion alluded to.   Subsequently the defendant was arrested at Blackwell's Island, and taken to the Tombs police court, in New York, at which place he asked Detective Patrick Lawlor if he could send a message to his brother.   The detective told him he could, and gave him a piece of paper and a pencil, on which he wrote down the name, "53 Bowery, Phœnix House."   The detective then said to him, "That is where the envelope was in that letter that you spoke about to your girl, was it?"  He says, "Yes; that is the letter that got me here."   The defendant then talked a few minutes more, and again says, "Can I play the crazy act on that letter?"   The detective says, "Did you write it like a crazy man, when you wrote it?"   He says "No; does it read like crazy?"   Detective O'Brien was also present, and heard some of the conversation that took place between Lawlor and the defendant.   He testified that the defendant asked Lawlor "if he thought the letter amounted to

anything, " and that Lawlor said to him : " You must have been a fool, if you thought somebody would call for that letter. The letter was to be answered and called for at 53 Bowery, New York. He then said to Lawlor, " Do you think I can play crazy on them ? " and Lawlor replied, " You must do something better than that."

Upon the trial the Testament was produced by Mr. Webb, and on the outside of the fly loaf was printed in pencil the name of "Michael Kelley," and on the inside of the same leaf was written the name " Michael Kelley," underneath which his age was stated. Mr. Webb and Susie Webb both testified that they saw the defendant write these names. There was a conflict between them as to whether the writing appearing upon the opposite page on the second fly leaf was in his handwriting, but as to the writing upon the first fly leaf they both agreed. They further testified that they had seen him write, knew his handwriting, and that the letter referred to was in his handwriting. Mr. Webb thought that the addresses upon the envelopes were also his, but Susie thought otherwise. On cross-examination it appeared that both Mr. Webb and Susie could read writing, but imperfectly, and that some of the words appearing upon the envelopes and in the letter they were unable to read. The Testament, letter, and envelopes were subsequently received in evidence. Objection was made to the reception in evidence of the Testament, or that portion thereof containing the handwriting of the defendant, and our attention is called to the cases of Hall v. VanVranken, 28 Hun, 403, and Pontius v. People, 82 N. Y. 349. But these cases occurred before the statute, when the old rule was in force, which permitted comparisons only with the genuine handwriting of the person already in evidence for other purposes. The first statute upon the subject was passed in the year 1880. It was subsequently amended by chapter 555 of the Laws of 1888. It pertains to the evidence and practice on civil and criminal trials. It authorizes comparison of a disputed writing with any writing proved to the satisfaction of the court to be the genuine handwriting of any person claimed. Under this statute the genuine handwriting of a person may be admitted in evidence for the purpose of comparison. Objection was further made to the testimony of the detectives, and the claim s now made that their testimony should have been excluded as

incompetent under section 395 of the Code of Criminal Proce
dure. That section provides that "a confession of a defendant,
whether in the course of judicial proceedings or to a private per-
son, can be given in evidence against him unless make under the
influence of fear produced by threats, or unless made upon a stip-
ulation of the district attorney that he shall not be prosecuted
therefor. * * *" There is no claim or pretense that the state-
ments made by the defendant to the officers with reference to the
letter were influenced by fear produced or threats made by them,
or that there was any communication whatever made to him by
the district attorney. So that there can be no question with re-
ference to the competency of the evidence under this provision of
the Code. The statements made by the defendant appear to have
been voluntary, and upon his own accord. Further objection was
made to the reception of the letter in evidence, but we find no
point made in the appellant's brief, neither was there any question
raised upon the argument, as to the letter's having been sufficient-
ly proven or identified. It is true that the testimony of Mr. Webb
and Susie, with reference to the letter's being in the handwriting
of the defendant, was somewhat impaired by their cross-examina-
tion. They were both poor readers, but it does not necessarily
follow that their judgment with reference to the handwriting of
the letter was worthless. Having but little correspondence, and
accustomed to seeing but few writings, that which has been called
to their attention may have been more carefully scrutinized and
more thoroughly and intimately known for that very reason. The
court, in passing upon the question as to the admissibility of a pa-
per in evidence, only determines whether there is evidence suffi-
cient to authorize the jury to find that it is genuine. Whether
the witnesses should be believed, together with the inferences to
be drawn from the facts and the circumstances, are questions for
the jury. In 4 Cow. & H. Notes to Phil. Ev. p. 476, it is said that
a witness who speaks of handwriting from having seen the person
write is competent, though he never saw him write but once, and
that where he has seen a party write, but has forgotten the charac-
ter of his hand, he may refer to that writing to retouch and streng-
then his recollection. In 1 Greenl. Ev. § 577, it is stated to be
sufficient for the purpose tha the witness has seen the party write

but once, and then only his name; that the proof in such cases may be very light, but the jury will be permitted to weigh it. In Com. v. Levy, 2 Wheeler, Cr. Cas. 245, a witness was called to prove the handwriting of the defendant, who stated that he had seen him write his name once, and believed the signature to the letter to be his handwriting. The defendant objected to the reception of the letter in evidence, on the ground that there had been no legal proof of his handwriting; but it was held that there had been some evidence to prove the signature to the paper, and that whether the evidence is sufficient to establish the fact was a question for the jury, and not for the court. In Magee v. Osborn, 32 N. Y. 669, it was held that the question of the genuineness of the defendant's signature, where a witness had sworn that he had seen the defendant write and that he believed the signature to be genuine, was sufficient evidence to require its submission to the jury. And in Hammond v. Varian, 54 N. Y. 398, it was held that where one has seen a party, whose signature is in question, write his name once, or has held his note acknowledged and conceded to be genuine, he is a competent witness as to the genuineness of the signature. Lott, C. C., speaking with reference to the objection to the testimony that the witness had not shown himself sufficiently acquainted with the defendant's handwriting to testify as to its genuineness, said: "The objection was not tenable. They had some means, although slight, of enabling them to judge whether the signature was that of the defendant, yet sufficient, in their belief, to express an opinion in reference thereto. The extent of their knowledge, and the weight or effect to be given to their opinion, were proper matters for the consideration of the jury."

We thus have a letter arriving at the post office near the residence of the Webbs, addressed as we have already stated, with a letter inclosed addressed to Susie, with a return envelope, with the postage paid thereon addressed to Hugh Foley, 53 Bowery, Phoenix House, N. Y. The letter inclosed purports to have been written by the defendant. After his arrest he asks the officer for permit to communicate with his brother. He then writes upon a paper handed him for that purpose the same address appearing upon the envelope for the return letter. He then states to the detective, in answer to his query, that the address is the same as

that upon the envelope inclosed in the letter addressed to the girl, and that it was that "letter that got me here," evidently meaning that it was the information derived from the letter that enabled the officers to find him and make the arrest. He then asks about the effect of the letter, and as to whether he can play crazy with reference thereto, thus recognizing its importance, and his own acts in writing the same. In the letter he asks Susie to write him, and tells her to inclose the answer in the envelope which he had inclosed. Both Susie and Mr. Webb recognize the handwriting in the letter as that of the defendant. All these conceded and undisputed facts, taken together in connection with the inferences which the jury properly may draw from the surrounding circumstances, are most convincing, and admit of but one rational conclusion. They not only make a case for the admission of the paper to the consideration of the jury, but also furnish ample evidence to justify a finding, beyond a reasonable doubt, that the letter was his.

A question is also made with reference to the charge of the court upon the question of the intoxication of the defendant at the time of the affray, although no request was made to charge differently, or exception taken to the charge as made. It is contended that the charge is so unintelligible as to leave the jury in doubt with reference to the true rule, and that for this reason a new trial should be ordered. It is evident that the judge had a mistaken idea of the law upon the subject, for he appears to have instructed the jury to the effect that if the defendant was totally intoxicated, so as to be wholly irresponsible from the intoxication, he would be entitled to an acquittal. This is not the rule where the intoxication is voluntary, unless accompanied with mania. A man cannot escape from the natural and inevitable consequences of his acts by reason of his voluntary intoxication. But murder in the first degree requires deliberation and premeditation; and, where a particular purpose, motive, or intent is a necessary element to constitute a particular specie or degree of crime, the fact of intoxication at the time must be taken into consideration, for the purpose of determining the motive or intent with which the act was committed. But the charge in this respect was more favorable to the defendant than it should have been, and it consequently did him no harm. The judge subsequently read to

the jury the provisions of section 22 of the Penal Code, which provides that: "No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act." Here we have the statute upon the subject in clear and concise language, with the attention of the jury specifically called thereto. And then, after the reading of this provision, the judge concludes his charge upon the subject by referring to People v. Fish, 125 N. Y. 136, 26 N. E. 319, and quoting therefrom the following: "To sustain an indictment for murder in the first degree, the people are bound to show that the defendant intentionally killed the deceased, with premeditation and deliberation. In weighing the evidence as to premeditation and deliberation, the jury is bound to take into account the condition of the defendant. If, however, it appears that the defendant, although intoxicated at time of the homicide, was sober enough to form an intent, and to deliberate and premediate the crime, his responsibility is the same as if he had been perfectly sober." It would seem that this quotation, together with the reading of the provisions of the Code, must have made clear to the minds of the jurors the true rule upon which they were to determine the question of the intention and the deliberation and premeditation under which the defendant acted. It appears that the defendant drank from the alcohol produced by George twice; that he also drank from the whiskey purchased by Webb once or twice, together with a little of the beer. The amount taken by him at the time of the drinking does not appear. Webb states that he did not appear to be drunk. After the affray he ran out of the house, then sent for his clothes, talked about the knife, what he had done, and then went away. The next morning he talked about the transaction, told about the trouble that he had had with George, and how he had stabbed him, thus indicating that he had a pretty clear recollection of the transaction.

There is nothing appearing in the evidence in reference to his condition which distinguishes the case from that of People v. Fish, supra. This case is clearly distinguishable from that of People v. Leonardi, 143 N. Y. 360, 38 N. E. 372. In that case the homicide was committed without provocation and without motive, by a person who at the time was very much intoxicated. In that case the court charged, in substance, that if the defendant had intelligence enough to know right from wrong, that the act he committed was wrong, he was responsible, but if he was bereft of reason, sense, and judgment, and that without knowledge or intent as to the result of his act he was irresponsible, and this was all the court would say as to the intoxication, as bearing upon the defendant's capacity to distinguish between right and wrong. Subsequently the court charged that if the defendant was sober enough to know what he was about, that the act was wrong, then his intoxication and motive would both exist, and the one would not destroy the other; that he must be completely intoxicated, in order to be excused, etc. This charge, for obvious reasons, was held to be erroneous.

Upon the trial the defendant showed by a witness that at the time of the homicide he was sick. The witness was then asked by the district attorney to state what was the matter with him, and the witness answered, giving the character of his disease. It is now claimed that this was error, and that the answer tended to prejudice the defendant before the jury. In the first place, no exception was taken to the admission of the evidence; and, in the next place, the defendant disclosed the character of his difficulty on two occasions,—one as an excuse for his going away the morning after the homicide, and the other for the purpose of showing that he was in the hospital, and not in the prison, on Blackwell's Island, at the time of his arrest. It is quite apparent that at the time of the trial it did not occur to the defendant that the evidence was harmful. He then, evidently, had more confidence in the intelligence and judgment of the jurors. It is now asking too much of a court, on review, to hold that the twelve jurors, selected with the care and deliberation with which the jurors were impaneled in this case, were so weak, incompetent, and utterly unfit for the discharge of the duty assigned to them, that they found this man

guilty by reason of the affliction or disease from which he was suffering.

It would seem that in the presenting of this case the impression prevailed that a murder trial is conducted under different rules, and in a different manner, from ordinary trials. If such an impression prevails, it is a mistake. If improper evidence is admitted, the attention of the court should be called thereto by an exception. If the judge misstates the law or the evidence, his attention should be called thereto, and an exception taken while he has an opportunity to correct his instruction to the jury. To dispense with these safeguards would enable attorneys to trick the court in nearly every trial that takes place. They may sit by, keep still, and permit incompetent evidence to be received, by their conduct impliedly consenting to its reception, and then, after a verdict against them, insist that it was error, and the judgment should be reversed. It is provided that "when the judgment is of death the court of appeals may order a new trial, if it be satisfied that * * * justice requires a new trial, whether any exceptions shall have been taken or not in the court below." Code Cr. Proc. § 527. Power is here given to the court of appeals to order a new trial when justice requires it. This power, however, should be exercised only in cases where manifest injustice has been done, and where it is apparent to the court that a different result ought to have been reached. People v. Kelly, 113 N. Y. 647, 21 N. E. 122; People v. Cignarale, 110 N. Y. 23, 17 N. E. 135; People v. Fish, 125 N. Y. 136–144; 26 N. E. 319. The judgment and conviction should be affirmed.

O'BRIEN, BARTLETT, and VANN, JJ., concur with MARTIN, J., for reversal. ANDREWS, C. J., and GRAY, J., concur with HAIGHT, J., for affirmance.

Judgment reversed.

### NOTE ON "PROOF OF HANDWRITING."

Other instruments of the same general character, proven to be in defendant's handwriting, are admissible, in a prosecution for forging a money order, for the purpose of comparison, and also, *it seems*, for the purpose of showing his guilty knowledge in passing such order. People v. Bibby (Cal.), 27 P. 781; 91 Cal. 470,