PEOPLE v. DONEBURG.

(Supreme Court, Appellate Division, Fourth Department. April 24, 1900.)

1. ARSON—EVIDENCE.

Defendant was accused of burning certain buildings belonging to his wife. The only motive he could have had was that she might secure the insurance thereon. The barn burned was used by several people, and was situated not far from the highway, and could be entered by any person. It was entered on the night it was burned by one who kept horses therein, and who sometimes smoked in the barn. He testified, however, that he did not smoke in the barn on the night it was burned. The night was a bright, moonlight night, and no one was seen near the barn. The fire was under considerable headway when discovered. *Held* not to show that the fire was of incendiary origin.

2. SAME—MOTIVE.

In a prosecution for arson, the state's witnesses testified that the property burned was worth from $700 to $800, although on cross-examination they admitted that it might cost $1,900 to $2,000 to rebuild it. The evidence was undisputed that it originally cost $1,500. It was owned by defendant's wife, and mortgaged for $1,560. It was insured for $1,300, loss, if any, payable to the mortgagee. The property was rented for a low rental, and was not a profitable investment. There was no evidence that defendant personally would be profited in any measure by its destruction, and the collection of the insurance, as the amount collected would have to be paid to the mortgagee. *Held* not sufficient to show beyond a reasonable doubt that defendant had a motive for burning the barn.

3. SAME—FOOTPRINTS AND TRACKS AS EVIDENCE.

Certain shoeprints in the soil of a plowed field near a burned building were measured, and the length and width thereof corresponded in size with a No. 9 shoe. Defendant wore No. 9 shoes. At one place near the fire marks were discovered apparently indicating that a person had crossed a ditch, and in so doing had fallen and struck his knee and one elbow against the bank. On the morning after the fire, defendant's trousers at one knee, and his coat at one elbow, were slightly soiled. The discoloration, however, was so slight as to hardly attract attention, and not different from what might be expected to be found on a laboring man's clothes. *Held* to be wholly useless as an aid in determining the question of defendant's guilt.

4. SAME.

Defendant, some time before the burning of the barn, with the firing of which he was charged, advised a person having some hay therein to take it out, and then he would have it if anything should happen; to which the owner of the hay answered that he did not expect anything to happen; whereupon defendant answered that "it was liable to." Defendant, four months prior to the fire, advised the occupant of a house near the barn fired, and which would be jeopardized if the barn should burn, to insure her household furniture. *Held* not to necessarily indicate an intention to burn the barn, but to be as consistent with innocence as with guilt.

5. SAME—SUFFICIENCY TO CONVICT.

Proof that a fire may have been incendiary; that defendant had an opportunity to set it; that his wife was interested to the extent of a few hundred dollars in having the property burned; that the morning following the fire tracks were found in a plowed field in the vicinity of the burned building which might have been made by defendant, and that several months previous to the fire he had advised a person whose house would be almost certain to burn in case the barn was fired, and which also belonged to defendant's wife, and was insured, to insure her household property; and that he had also, several months before the fire, advised a person who had hay in the burned barn to remove it therefrom, and then he would have it in case anything happened. and that something was liable to happen,—is, though unexplained, insufficient to convict defendant of burning the barn.

Appeal from Jefferson county court.

John Doneburg was convicted of arson in the second degree. From a judgment of conviction, and from an order denying a motion for a new trial, he appeals. Reversed.

The defendant was indicted by the grand jury of Jefferson county, at a trial term of the supreme court held in and for said county in October, 1896, for the crime of arson, second degree, for having, at the town of Worth, in said county, on the 23d day of April, 1896, at about 11:30 p. m. of that day, willfully and feloniously set fire to and burned a barn, the property of one Sarah Doneburg, adjoining and within the curtilage of a dwelling house which at the time was occupied by one Nancy Horning. The indictment was duly removed into the county court of Jefferson county. The defendant was tried thereon at the February, 1897, term, and was convicted and sentenced to the state prison at Auburn for the term of 7 years and 8 months. At the close of the plaintiff's case, and also at the close of the entire evidence, the defendant moved for his discharge upon the ground, among others, that the facts proved were not, as matter of law, sufficient to justify a submission of the case to the jury or to justify a conviction. Each of said motions was denied, and exceptions duly taken. A motion was also made for a new trial, on the ground, among others, that the verdict was contrary to law, that it was not supported by the evidence, and was against the weight of evidence. That motion was also denied, and an exception taken.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

George W. Reeves, for appellant.
V. K. Kellogg, for the People.

McLENNAN, J. The only important question to be determined upon this appeal is, was the evidence given upon the trial sufficient to establish the defendant's guilt beyond a reasonable doubt? The record is voluminous, 23 witnesses having been called by the people, and 16 by the defendant, their testimony covering more than

400 pages of the printed record. The evidence given on behalf of the prosecution may be classified as follows: Evidence tending to prove—First, that the fire was of incendiary origin; second, that the defendant had opportunity to commit the crime charged; third, motive; and, fourth, evidence of certain circumstances, and of statements and acts of the defendant before and after the fire, all of which, it is urged, when considered together, are sufficient to support the verdict of the jury.

The building which it is claimed was set on fire was a barn at Worthville, Jefferson county, N. Y., a small hamlet consisting of a few dwelling houses, a church, hotel, school house, blacksmith shop, and three stores, situate at the four corners made by the crossing at right angles of the "Rodman Road," so called, extending north and south, and the "Adams Road," so called, leading directly west to Bullock's Corners, a distance of about one mile, then northerly a short distance, where it turns again to the west, and leads to Adams, a village on the line of the Rome, Watertown & Ogdensburg Railroad, about nine miles distant from Worthville. Within a radius of one-fourth of a mile from the four corners 75 to 100 people reside. The barn was situate on the west side of the Rodman road, 114 feet from the corner, and 18 feet from the sidewalk. It was owned by Sarah Doneburg, the wife of the defendant, as was also a dwelling house on the same lot, 36 feet to the north. The dwelling house was occupied by a family, tenants of Mrs. Doneburg. On the lot next north, 23 feet from the Doneburg house, was a dwelling house, also occupied by a family. There was a house on the corner lot south of the Doneburg barn, 33 feet distant, which was also occupied. The barn was so situate that to burn it would naturally cause the destruction of the house upon either side, which was in fact the result. The defendant's son-in-law, a Mr. Greenly, resided a short distance from Bullock's Corners, on the Adams road, and about one mile from where the barn was located. On the night of April 23, 1896, at about 11:30 o'clock, the barn was discovered to be on fire. At the time it was filled with fire and smoke, and the flames were bursting out. The first must have started as early as 11 or a quarter past 11 o'clock. The night was light, there being practically a full moon, and the weather was pleasant. To reach the barn from the west by the Adams road, it was necessary to pass directly in front of at least six dwelling houses and the hotel on the southeast corner, in the village of Worthville. The defendant was not seen in the village at the time of or for several weeks previous to the fire, nor until about 9 o'clock on the following morning, when he was seen with his son-in-law going from the latter's residence at Bullock's Corners towards the village. The evidence which in any way tends to connect the defendant with the fire is entirely circumstantial.

A Mr. Cameron, a witness called by the people, testified that he kept his horse in the barn, and that in the evening before the fire, about 9 o'clock, he went to the barn with a lighted lantern to care for the horse. He testified that the fire was not started by him or at that time, although he states that he was in the habit of some-

times smoking in the barn, but that he did not smoke on that occasion. The witness Grimshaw occupied the barn to store a peddling wagon and other property, and at all times had access to it. The Horning family, who occupied the Doneburg dwelling house, consisted of Adelbert Horning and his wife, Nancy Horning, the mother of Adelbert, and three children, 9, 7, and 3 years old, respectively. Adelbert Horning had two horses in the barn, which his wife cared for, and on the night in question Howard Horning, a nephew of Adelbert, was there with two horses. These horses, it is said by the witnesses, were cared for about 5 o'clock by Howard and Mrs. Horning, and both state that they did not afterwards enter the barn previous to the fire. Others occupied the barn for keeping cows, a pig, etc. The doors were kept unlocked, and all the persons occupying the barn for any purpose, including the Horning children and others, had access to it at all times. It was only 18 feet from the sidewalk, and any person could enter it at will from the highway. No one was discovered in or about the barn after Cameron was there at 9 o'clock, although the night was light,—so light that objects could be seen and distinguished for a long distance. The Horning and Grimshaw families, living 23 and 33 feet distant from the barn, respectively, did not retire before 10 o'clock on the night in question, and other families in the immediate neighborhood did not retire or extinguish their lights until after that hour.

An examination of the entire evidence fails to disclose a single circumstance, so far as the character or description of the fire is concerned, or which relates to the character, occupation, or accessibility of the barn, which tends to establish that the fire was incendiary, and not accidental. The evidence, at least, is quite as consistent with one theory as the other.

The evidence offered for the purpose of showing that the defendant was in a situation where he might have committed the crime, or that he had opportunity to commit it, is confined to proof of the fact that the defendant resided at Pulaski, Oswego county, N. Y.; that on the evening of the 23d of April, 1896, he left his home on the train leaving Pulaski at 7:30 p. m., for the village of Adams, where he arrived at 8:32, got off the train, looked about the village for an opportunity to catch a ride to his daughter's home at Bullock's Corners; and that, when the defendant was arrested by the witness Huson, he told the witness that upon the night in question he walked the entire distance from Adams to his son-in-law's, where it is conceded he stopped overnight. The claim of the prosecution is that the defendant walked from the station at Adams, where he arrived at 8:32 p. m., to Worthville, a distance of nine miles, set the fire, which was discovered at 11:30, and which must have started at least as early as 11:15, and then walked back to his son-in-law's at Bullock's Corners, a distance of a mile. No one claims to have seen the defendant at Worthville, or in the vicinity of the fire, at the time or previous thereto. The defendant was a large, fleshy man, weighing nearly 225 pounds. He concededly was in the habit of visiting his daughter several times a year, and his evidence is to

the effect that he walked from the station to his daughter's on the night in question, arriving there at 11:30 o'clock, and when the fire had so far progressed that it could be seen from the residence of his daughter; that he, his daughter, and her husband all saw it, but could not, from that distance, determine its location.

Notwithstanding the distance from Adams to Worthville, the character and condition of the road at the time in question, the evidence was perhaps sufficient to warrant the jury in finding that the defendant could have reached Worthville in time to have set the fire, although in order to do so he must have walked the distance of nine miles in not more than two hours and a half, and have gone through the village, and back to his daughter's, on a bright, light night, without being discovered or seen by any one. In order to reach such conclusion, the jury must have wholly disregarded the testimony of the defendant, his daughter, and her husband, who testified that he was at their house at Bullock's Corners at 11:30; because it will hardly be urged that the defendant could have walked from Adams to Worthville, set the fire, and returned to his daughter's before 11:30 o'clock. While, however, the evidence upon this branch of the case is unsatisfactory, we would not be disposed to disturb the finding of the jury in that regard, if that finding alone were involved.

The evidence relating to motive is equally meager and unsatisfactory. Both the barn and dwelling house were owned by Sarah Doneburg, the wife of the defendant, and legally he had no interest in them. The defendant procured the property to be insured on the 1st day of May, 1895, for $1,500,—$1,000 on the house, $300 on the barn, and $200 on farm produce, mowing machine, horse rake, etc.; which made the insurance on the barn and house $1,300. It had been insured for several years for the same amount. It is claimed by the prosecution that the house and barn were insured for more than their value, and that it was for the interest of the defendant to have them destroyed. No question is raised as to the value of the personal property. Stephen Grimshaw, a witness called by the people, upon direct examination testified that the house and barn were not worth at the time of the fire to exceed $600, and that the lot without any buildings upon it was worth $50. On cross-examination he testified that he could not state that it would not cost $400 to reproduce the barn, and $1,600 to build the house. He thought they could be built for that. The witness Emory Perkins testified that, in his judgment, the property was not worth to exceed $700. Charles Ramsey testified that, in his judgment, the property was worth not to exceed $800; that, in his judgment, the barn could not be built for less than $400; and that the house could not be built for less than $1,500. The witness David Fawdery, called by the defendant, who had a mortgage upon the premises for $1,560, testified that, in his judgment, the house was worth $1,200, and the barn $400. Oren Greenly, a witness called by the defendant, testified that, in his judgment, the premises were worth between $1,600 and $2,000; Eugene Greenly, that they were worth $1,500 to $1,600. O. D. Green, a contractor and builder, fixed the

value at $1,500 to $2,000. It appears that the property cost the defendant $1,500 in 1888; that the dwelling house was a large one, —one of the best in the village. There is evidence tending to show that the defendant's wife was only receiving a small rental from the property, and that it was not a profitable investment.

The foregoing is substantially all the testimony which tends to prove that the defendant had a motive for committing the crime charged. It is urged on the part of the people that to secure to his wife from $400 to $600, the excess of the insurance over the actual market value of the property, was a sufficient motive to induce the defendant to burn the property in question,—an act which would endanger the property of the entire hamlet, and the lives of those living in the adjoining houses. Fawdery, the mortgagee, was willing to loan upon the property more than the amount of the insurance. Concededly, the property cost more, and the amount of the insurance would not rebuild the structures destroyed. There is no evidence tending to show that payment of the mortgage was being pressed. Any sum realized from the insurance would be applied upon it, and would not result in putting the defendant or his wife in ready funds. There is no proof tending to show that, in any event, the defendant would profit one cent by the destruction of the buildings. The insurance was payable to the mortgagee to the amount of his mortgage, and any balance would belong to Mrs. Doneburg, the owner. The appraisers selected by Mrs. Doneburg and the insurance company to adjust the loss fixed the value of the house at $1,200, and the barn at $300, and the insurance company paid that amount in settlement of the loss, without suit. Many other considerations might be suggested, based upon the evidence, which would seem to negative the idea that there was any sufficient motive to induce the defendant to commit the crime charged. While the evidence is conflicting, we think it fails to establish motive beyond a reasonable doubt.

Considerable evidence was given by the people for the purpose of showing that certain footprints which were discovered on the morning after the fire, in the vicinity of the burned building, and along a footpath leading from the Adams road across a plowed field towards Worthville, were made by the defendant. Without referring to the evidence in detail, it may be said that a large number of tracks, many of them concededly not made by the defendant, were measured by different witnesses. No track measured had any distinguishing mark or characteristic to show that it was made by the defendant. Some of the tracks measured were those made by a person wearing an ordinary No. 9 shoe, the size of shoe worn by the defendant, and only from that fact is it sought to connect the defendant with such tracks. The evidence is equally applicable to any other person wearing a No. 9 shoe. The shoes worn by the defendant were not compared with the tracks. The tracks were simply measured, and found to be of a certain length and width, and that they corresponded in size to a No. 9 shoe. At one place, where apparently a person had crossed a ditch near the place of the fire, marks were discovered which it is claimed indicated that

the person had stumbled and struck his elbow and knee against the bank of the ditch; and witnesses testified that on the morning after the fire defendant's trousers at one knee, and his coat at one elbow, were slightly soiled. An examination of the evidence shows that the discoloration, if any, was so slight as hardly to attract attention, and not different from what would be expected to be found on a laboring man's clothes. The evidence relating to footprints, and to the other marks referred to, is of such a character as to be wholly useless as an aid in determining the question of the defendant's guilt.

In Burrill, Circ. Ev. 267, it is said:

"Where no peculiar marks are observed, but the correspondence thus proved is merely in point of superficial shape, outline, and dimensions, and those of the ordinary character, it may serve to confirm a conclusion established by independent evidence, but cannot be in itself safely relied on, on account of the general resemblance known to exist among the feet and shoes of persons of the same age and sex."

In People v. Newton, 3 N. Y. Cr. R. 413, it was said:

"Tracks made in the soil, although they correspond in dimension with the shoes worn by the person charged, have very little significance, unless there be some distinguishing peculiarity in such tracks and shoes."

The alleged declarations or admissions of the defendant, which it is claimed indicate guilt, consist of a statement made in February, 1896, to Spalsbury, who lived in the house next south, and who had some hay in the barn which he had cut on shares, and which had not been divided. Spalsbury testified that the defendant said:

" 'I am up here, and you had better get your part out, or part of it, and then you will have it.' He says, 'Then, if anything should happen, you will have it.' I says, 'I don't expect anything is going to happen.' Well, he made the remark, I think, 'It is liable to,' or something of that kind."

Evidently Spalsbury paid no attention to the suggestion, for he did not get the hay out of the barn. At all events, the statement is quite as susceptible of an innocent as of a wicked meaning.

Mrs. Horning, a witness called by the people, testified that in January before the fire the defendant was at her house, and that the following conversation took place: The defendant said:

" 'Mrs. Horning, are your things insured here,—your house furniture and things? I suppose they mostly belong to you.' I says, 'No, they ain't insured.' He says, 'They should be insured; you are liable to burn out at any time, and you are poor, and you need it.' And I says, 'Our time will be up, Mr. Doneburg, the 9th of April, and if we stay any longer I shall try and get them insured;' and he says, 'You can get them transferred, and it won't cost you much anywhere you move; you can get them transferred, and you better do it now.' "

This evidence, it is urged, indicates an intention at that time on the part of the defendant to commit the crime with which he is charged. Certainly, it was very proper advice for any man to give, and advice which, as a rule, is followed. We do not think it can be said to be any indication of criminal intent or purpose for a person, when he discovers that the property of a friend or neighbor is not insured, to advise that such precaution be taken against loss by

fire. It would seem to be unreasonable that the defendant should be solicitous for the property of Mrs. Horning, and yet be willing to set fire in the nighttime to a building adjoining the house in which herself, her mother, and three children were sleeping, and under such circumstances that the house would certainly be consumed.

The witness Huson testified that when he arrested the defendant the defendant said to him that he would have been out of the way if he had known there was going to be any trouble about the fire. The defendant denies having made the statements attributed to him, or, at least, in such form as to make them susceptible of the interpretation or meaning given them by the witnesses. If the evidence relating to the alleged statements of the defendant in this case is examined, it will be found that it is such as to make the statement of the court of appeals in People v. Corey, 148 N. Y. 476, 42 N. E. 1066, fully applicable, that "admissions are the weakest and most unsatisfactory form of evidence." Each of the statements, even if made precisely as related by the witnesses, is quite as indicative of an innocent intent as of a guilty purpose.

Thus far we have only referred to the evidence given on behalf of the prosecution, and we are of the opinion that it, unexplained, wholly fails to justify a conviction of the defendant of the crime charged in the indictment. The most that can be said for it is that it tends to prove that the fire may have been of incendiary origin; that the defendant had opportunity to set it; that his wife was interested to the extent of a few hundred dollars in having the property burned; that in the vicinity of the fire, the morning following, tracks were found which might have been made by the defendant; and that months previous to the fire the defendant advised Mrs. Horning to insure her personal property, and Mr. Spalsbury to get his share of some hay out of the barn. We discover nothing in the testimony relating to the acts or statements of the defendant, on the morning or day after the fire, which can be regarded as unusual or suspicious, or in any sense indicative of guilt. The defendant, who testified in his own behalf, asserted his innocence in the most positive terms. He stated that he walked from the station at Adams, where he arrived at 8:32, to the home of his daughter, near Bullock's Corners, about a mile from Worthville; that his daughter and her husband had retired for the night; that he aroused them to let him in; that he arrived there at 11:30; that at that time they could and did see from the stoop of the house a building burning, but that between them and the village of Worthville there were a hill and some woods, which prevented them at that distance from locating the fire, or the property which was being burned; that after watching it a few minutes they all retired for the night, and were not aware that the property in question had been destroyed until the following morning, when they were informed of the fact by the neighbors. The defendant's daughter and her husband testified to the same facts. It appears that the defendant was in the habit of going to his daughter's several times a year, sometimes in the evening, and he explains, apparently plausibly, why he went upon the occasion in question. His evidence was con-

sistent throughout, and apparently there is nothing to indicate that he attempted to prevaricate or testify untruthfully. In addition, it may be said that some eight witnesses, apparently men of character and standing in the community, who had known the defendant for many years, testified without qualification to his good character. They stated that in their opinion the defendant's character and reputation was "No. 1"; was good; that he was an absolutely honest man.

After careful consideration of all the evidence, the conclusion is reached that it wholly fails to justify the conclusion that the defendant is guilty of the crime charged in the indictment. It follows that the judgment on conviction and order appealed from should be reversed, and new trial ordered.

Judgment on conviction and order reversed, and a new trial ordered, and case remitted to the clerk of Jefferson county, pursuant to section 547 of the Code of Criminal Procedure. All concur.